**E-FILED on** 12/20/2010

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re 3DFX INTERACTIVE, INC., a California Corporation,<br><br>    Debtor.<br>WILLIAM A. BRANDT, JR. TRUSTEE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>NVIDIA CORPORATION a Delaware Corporation, and NVIDIA US INVESTMENT COMPANY, f/k/a TITAN ACQUISITION CORP. NO. 2, a Delaware corporation,<br><br>    Defendants and Respondents. | No. C-08-04634 RMW<br><br><br>ORDER AFFIRMING JUDGMENT OF BANKRUPTCY COURT |

William A. Brandt ("Trustee"), the Chapter 11 Trustee on behalf of creditors of 3dfx Interactive, Inc. ("3dfx"), brought this adversary proceeding under the avoidance powers given to him as Trustee under 11 U.S.C. § 544(b)(1) against NVIDIA Corporation ("NVIDIA") alleging claims for relief based upon California's Uniform Fraudulent Transfer Act (Cal. Civ. Code §§ 3439.04(a) and (b) and 3439.05). The Trustee now appeals the Bankruptcy Court's determination after trial that 3dfx's creditors were not injured by the challenged transaction in which NVIDIA purchased certain 3dfx assets. The Bankruptcy Court issued an 87 page Memorandum Decision on

ORDER AFFIRMING JUDGMENT OF BANKRUPTCY COURT—No. C-08-04634 RMW
CCL

April 30, 2008 and an Order After Trial on May 1, 2008. Thereafter, on September 8, 2008, NVIDIA successfully moved for summary judgment. The Bankruptcy Court ruled that the Court's Memorandum Decision and Order After Trial negated at least one element of each of the Trustee's causes of action. Judgment was entered on September 11, 2008, and the Trustee timely filed his Notice of Appeal on September 22, 2008.

The Trustee contends that the judgment of the Bankruptcy Court should be reversed and judgment entered in favor of the Trustee, or, alternatively, the Trustee requests a new trial. NVIDIA argues that the judgment of the Bankruptcy Court should be affirmed. The ultimate question is whether the assets transferred to NVIDIA by 3dfx pursuant to their Asset Purchase Agreement exceeded the approximately $70 million NVIDIA paid to 3dfx. The answer depends on whether a business or workforce was purchased by NVIDIA in the transaction and, if so, what value should be attributed to that business or workforce.

For the reasons stated below, the Court concludes that NVIDIA did not purchase a business or workforce and that 3dfx received fair value for what it sold to NVIDIA. The Court, therefore, affirms the judgment of the Bankruptcy Court.

## I. BACKGROUND

At various points in its approximately eight-year life, 3fdx developed graphics chips, graphics boards, and software related to 3D graphics processing. The company's signature product, known as the Voodoo Graphics chipset, was a retail add-in graphics card that shipped in subsequent versions in 1997, 1998, and 1999. Memorandum Decision After Trial, Case No. 02-55795, Adversary Proceeding Case No. 03-5079, 6 (Bankr. N.D.Cal. April 30, 2008) (hereinafter "Trial Order").

Before May of 1999, 3dfx was in the "merchant chip business," designing graphics chips for sale to other companies who were using the chips in their products. *Id.* at 7. 3dfx then sought to vertically integrate its business and thereby allow it to deliver 3dfx-designed graphics boards directly to the retail/distributor market. It acquired STB Systems ("STB"), a Texas-based graphics board company, in May of 1999. *Id.* The merger with STB turned out to have unintended consequences, however, as it put 3dfx in direct competition with some of its previous customers. *Id.*

at 8. After the merger, 3dfx lost two customers who accounted for 58% of its 1998 revenues, and STB was unable to incorporate other companies' graphics chips into its boards. *Id.* Alex Leupp ("Leupp"), CEO of 3dfx from December of 1999 through March of 2002, eventually characterized the STB acquisition as a mistake. Decl. of Alex Leupp ¶ 6, Trial Ex. BV (hereinafter "Leupp Decl."). In July of 2000, 3dfx completed a merger with Gigapixel Corporation ("Gigapixel") in an attempt to hire additional engineers and take advantage of that company's relationship with Microsoft and the X-Box gaming system (then in development). Trial Order at 8-9.

By the fall of 2000, 3dfx had suffered six consecutive quarterly losses, had essentially run out of cash, and had even invited bankruptcy counsel to a board meeting held on November 20, 2000. *Id.* at 11. Because of these financial troubles, the company started looking for financial assistance in the market. Leupp Decl. ¶ 9. 3dfx engaged Robertson Stephens to explore possible transactions. *Id.* ¶ 10. 3dfx had serious discussions about a transaction with two companies: Via Technologies ("Via") and NVIDIA. Trial Order at 15-17. On December 7, 2000, Via proposed investing a total of $40 million into 3dfx, with $15 million (secured by essentially all 3dfx assets) funded upon signing of definitive documents and an additional $25 million delivered upon completion of certain milestones, including the delivery of a new chip design by a specified deadline. Trial Order at 15. The same day, NVIDIA proposed purchasing certain 3dfx assets for $100 million cash, so long as at least fifty-six of 3dfx's selected design engineers would accept employment offers at NVIDIA. *Id.* If fewer than fifty-six accepted, there would be a $1 million reduction in the purchase price for each engineer fewer than the fifty-six sought. *Id.* The 3dfx board met on December 9, 2000 to consider the competing offers. *Id.* The board voted 4-3 to pursue a transaction with Via and to reject the NVIDIA proposal. Leupp Decl. ¶ 6.

However, the board notified NVIDIA that it was open to a revised offer, and on December 10, 2000, NVIDIA submitted a revised offer that the board accepted. *Id.* NVIDIA's revised offer provided that NVIDIA would pay $60 million in cash to 3dfx as well as one million shares of NVIDIA stock. Decl. of Jen-Hsung Huang ¶ 20, Trial Ex. BT (hereinafter "Huang Decl."). The offer also initially included a $15 million set-aside by NVIDIA earmarked to pay bonuses to 3dfx engineers who accepted employment with NVIDIA. *Id.* After further negotiations, 3dfx and

1  NVIDIA agreed to do away with the $15 million set-aside and to increase the cash payment to 3dfx
2  by $10 million. *Id.* ¶ 23. The final documentation for the transaction is the Asset Purchase
3  Agreement ("APA") along with other supporting documents. Trial Order at 17 (APA is Trial Ex.
4  5047).

5  Before 3dfx bought STB, 3dfx and NVIDIA were rivals in the graphics-chip business. As
6  Leupp described it, "[t]he two companies were rivals down to the bone . . . ." Leupp Decl. ¶ 27.
7  NVIDIA's CEO Jen-Hsun Huang testified that after the STB merger, NVIDIA no longer viewed
8  3dfx as a direct competitor, since NVIDIA's business focused on selling chips to original equipment
9  manufacturers, while 3dfx made add-in graphics boards for retail sale. Trial Order at 9. Despite
10 this change, Leupp was still concerned that not many 3dfx engineers would accept jobs at NVIDIA.
11 Leupp. Decl. ¶ 27. This concern apparently made NVIDIA's initial $100 million offer that was
12 conditioned on a certain number of 3dfx employees accepting employment at NVIDIA less attractive
13 to 3dfx than Via's offer. *Id.* The hiring of 3dfx employees, however, was of primary concern to
14 NVIDIA. As Huang states in his declaration testimony: "What was important to NVIDIA in this
15 transaction was not the value of the assets that we were buying, but the opportunity to be first in line
16 to recruit the 3dfx design engineers. We were willing to pay a premium over the value of 3dfx's
17 assets to get that head start over other potential suitors for the 3dfx engineers. I accepted the risk
18 and bet on NVIDIA that we would be successful if we had the first shot at telling them the
19 compelling NVIDIA story and vision for graphics." Huang Decl. ¶ 25. Indeed, according to Huang,
20 NVIDIA "conducted no formal appraisal of those assets before signing the Asset Purchase
21 Agreement, because the value of those assets was not what drove my interest in doing the deal or the
22 purchase price I was willing to pay." *Id.* ¶ 24. Finally, Huang stated that another of NVIDIA's
23 concerns in pursuing the transaction was the competitive strength the deal would provide NVIDIA
24 over Via. *Id.* ¶ 26.

25 The APA defines the assets to be sold in Section 1.1:

26 all of the properties, rights, interests, and other tangible and intangible assets
   (wherever located and whether or not required to be reflected on a balance sheet
27 prepared in accordance with GAAP) ... that are or were used in ... or that otherwise
   directly or indirectly related to, the graphics business of the Seller Corporations (the
28 "Graphics Business")

APA ¶ 1.1. In Sections 1.1(a)-(i) the APA defines "Specified Assets" to include, without limitation:

> (a) Patents, Patent Applications, Trademarks, Tradenames; (b) Other Proprietary Assets, (defined as all Proprietary Assets and goodwill of the Seller Corporations, copyrights, trade secrets, know-how, computer software, inventions, designs, drawings, existing and in-development chip designs and related specifications, source codes, verification and validation environments, manufacturing specifications and databases, in-process research and development, product reviews); (c) Inventory, Equipment, and Other Tangible Assets; (d) Contracts; (e) Governmental Authorizations; (f) Claims; (g) Other Assets (defined as including existing and in development chip designs, related specifications, source codes, customer lists); (h) Books and Records; and (i) Proceeds.

*Id.* ¶ 1.1(a)-(i).

On December 23, 2005 the Bankruptcy Court granted in part and denied in part the Trustee's motion for summary judgment that 3dfx transferred its business to NVIDIA pursuant to the APA and that the transfer constituted an avoidable fraudulent transfer. The Trustee relied in large part on NVIDIA's representation on the Notification and Report Form it filed pursuant to the Hart-Scott-Rodino Act to get regulatory approval for its transaction with 3dfx. NVIDIA put in the box entitled "VALUE OF ASSETS" the statement "Approximately $108 million." The Bankruptcy Court ruled:

> Assuming nVidia completed the Notification in conformity with section 801 of the Code of Federal Regulations, the value of the assets listed on the Notification is either the fair market value or the acquisition price, if greater than the fair market value. Permitting nVidia to assert in this action that the transaction value is other than $108 million would be inconsistent with its representation of the transaction value in the Notification. Judicial estoppel forecloses such a result.
> The court denies summary judgment regarding what precisely comprised the transaction and the value, if any, ascribed to the various components of the transaction because there are material facts in dispute regarding these questions. Summary judgment for Trustee is also denied regarding the avoidance of the transaction as a fraudulent conveyance because the question as to what extent the transaction components satisfy the fraudulent conveyance elements depends upon the determination of material facts that are in dispute.

Order Granting in Part and Denying in Part Trustee's Motion for Summary Judgment dated December 22, 2005 at 5:22-6:4.

The parties disagree as to the meaning and effect of this ruling. However, the Bankruptcy Court seems to have made a distinction between "transaction value" and the fair market value of assets and what components of the transaction should be considered in

ORDER AFFIRMING JUDGMENT OF BANKRUPTCY COURT—No. C-08-04634 RMW
CCL                                       5

evaluating the transfer for the purpose of deciding whether it was fraudulent as to 3dfx creditors.

## II. ANALYSIS

The Court finds the Bankruptcy Court's Memorandum Decision to be a thoughtful and sound analysis of the disputed issues. Therefore, it is hereby adopted as the opinion of this Court. The Court will highlight some points with respect to the Trustee's assertion that a graphics-chip business or a workforce was transferred as part of NVIDIA's purchase of 3dfx's assets. Otherwise, the Court finds no need to amplify on the Bankruptcy Court's analyses of the valuation testimony.

The Trustee's argument on appeal, including the assertion that a business of workforce was transferred in the APA, raise primarily questions of fact, and the Bankruptcy Court's resolution of factual issues may be overturned only if they are "clearly erroneous." Fed. R. Bankr. P. 8013; Fed. R. Civ. P. 52(a)(6). The Court does not find that the bankruptcy judge in rendering his Memorandum Decision made any clearly erroneous factual findings.

### A. Effect of Order Granting in Part and Denying in Part Summary Judgment

The Trustee asserts that the Bankruptcy Court's summary judgment order fixed the value of the assets at no less than $108 million at the time the Notification and Report Form was filed by NVIDIA. Although how the order should be construed is not entirely clear, it appears that the Court found triable issues of fact as to: (1) what assets were actually transferred; (2) the value of whatever the components of the transaction were; and (3) what assets, if any, are subject to avoidance as a fraudulent transfer. Therefore, the order does not preclude NVIDIA from claiming that although the transaction had a value to it of $108 million, the assets actually transferred had a fair market value of $70,000 or less and that the creditors were not injured by the transfer. As discussed in the Memorandum Decision and below, the creditors were not harmed by the transfer because there was no business or workforce that NVIDIA acquired.

### B. No Transfer of a Graphics-Chip Business

The Trustee argues that certain statements submitted by NVIDIA to the SEC show that a graphics-chip business was transferred. These statements are: (1) "Even though the

group of engineers did not remain a separate entity (or division) or create products under the 3dfx name, they had the ability to continue business activities they conducted before the acquisition"; (2) "The missing elements to continue the [3dfx's] business were minor, consisting primarily of accounting and human resource systems, and easily replaced"; and (3) the goodwill recorded in the transaction "represents the greater than normal earning power associated with acquired assets." Trustee's Reply Br. 10. Even with these statements to the SEC, however, the bankruptcy judge's finding that a graphics chip business was not transferred is adequately supported and does not involve an abuse of discretion.

### C. No Transfer of a Workforce

The Trustee points to three primary pieces of evidence as establishing that a workforce was transferred: (1) statements in correspondence with the SEC in which NVIDIA states that "[i]n the 3dfx purchase, NVIDIA acquired over 100 skilled chip engineers," (2) statements in a valuation report produced by Deloitte & Touche, which "acknowledged" that NVIDIA had acquired an engineering workforce, and (3) evidence that hiring 3dfx engineers was a primary goal of the transaction. Trustee's Opening Br. 16-17. The Trustee appears to concede, however, that the explicit terms of the APA do not mention the transfer of a workforce. Trustee's Reply Br. 14-15. In light of the negotiations leading up to the finalization of the APA, where employee-hiring related provisions were successively eliminated, these statements do not conclusively establish that a workforce was transferred. Moreover, the APA provides no requirement for 3dfx employees to accept jobs at NVIDIA, nor is the amount of consideration for the transaction dependent on whether NVIDIA hires 3dfx employees. Respondent's Br. 25. Had not a single 3dfx employee accepted a job at NVIDIA, NVIDIA would have had to pay the same amount on the same terms for 3dfx's assets. The 3dfx employees were not an intangible asset nor some form of goodwill transferred by the APA from 3dfx to NVIDIA. The Court finds no abuse of discretion in the bankruptcy judge's order holding that the transaction did not include a transfer of a workforce.

### D. Market Evidence Supports the Defense

The market provides the best evidence of the value of what was transferred to 3dfx. Via was in competition with NVIDIA for the purchase of 3dfx's assets and, in fact, made a proposal that was more attractive to 3dfx than NVIDIA's initial offer. Via's offer did not have any contingencies related to 3dfx's engineers going to work for Via.  NVIDIA had to increase its cash payment, offer stock in NVIDIA and eliminate any contingency related to the willingness of 3dfx engineers to accept employment with NVIDIA in order to make its deal with 3dfx.  There is no reason to believe that 3dfx did not get full value for NVIDIA's purchase.  Although NVIDIA hoped that it could successfully hire some of 3dfx's engineers, the deal was not contingent on NVIDIA's success in doing so and 3dfx had no obligation to request or otherwise encourage its engineers to go to work for NVIDIA. However, even if what NVIDIA acquired is treated as a business or workforce, 3dfx received fair value given that the sale was made after arms' length negotiations between sophisticated well-represented parties.[1]

### III.  ORDER

For the foregoing reasons, the Court AFFIRMS the judgment of the Bankruptcy Court.

DATED:      12/20/2010

RONALD M. WHYTE
United States District Judge

---

[1] The Bankruptcy Court actually concluded that NVIDIA paid more for 3dfx's assets than their fair market value because NVIDIA hoped to accomplish objectives through the transaction beyond the acquiring of property.  Those objectives are not reachable by creditors.